UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

THE PERMANENT MISSION OF THE
REPUBLIC OF ESTONIA TO THE UNITED
NATIONS and TIINA INTELMANN,

                Plaintiffs,          06 Civ. 3144 (RWS)

   -against-                   OPINION

ALFRED THOMPSON, PAUL GALVIN, NEW
START LLC, RUTH M. GOLOD, BILL
MARTIN, CORCORAN GROUP REAL
ESTATE, and BENJAMIN JAMES
ASSOCIATES, INC.,

                Defendants.

------------------------------------X

A P P E A R A N C E S:

    Attorneys for Plaintiff

    GALE P. ELSTON P.C.
    111 Broadway, 11th Floor
    New York, NY 10006
    By: GALE P. ELSTON, ESQ.


    Attorneys for Defendants

    TODD ROTHENBERG, ESQ.
    271 North Avenue, Suite 407
    New Rochelle, NY 10801

**Sweet, D.J.,**

The plaintiffs The Permanent Mission of the Republic of Estonia to the United Nations (the "Mission") and Tiina Intelmann ("Intelmann") (the "Plaintiffs"), the Ambassador of the Republic of Estonia to the United Nations, brought this action against Alfred Thompson ("Thompson"), Paul Galvin ("Galvin"), New Start, LLC ("New Start" or the "Landlord"), Ruth M. Golod ("Golod"), Bill Martin ("Martin"), Corcoran Group Real Estate (the "Corcoran Group"), and Benjamin James Associates Inc. ("James Associates") (the "Defendants"). Based upon the proceedings set forth below and upon the following findings of fact and conclusions of law, judgment for the Mission will be granted against New Start.

## Prior Proceedings

On April 24, 2006, the complaint of the Mission and Intelmann was filed. The complaint alleged first and second causes of action for fraud, a third cause of action for misrepresentation, a fourth cause of action for slander, and a fifth cause of action for trespass.

The docket does not contain a return of service or answer by any of the Defendants.

1

On September 25, 2006, the Mission obtained an order to show cause returnable on September 28 seeking a mandatory injunction requiring Thompson, Galvin and New Start (the "New Start Defendants") to pay the plaintiffs $118,500.

On September 28, 2006, the motion was adjourned at the request of Thompson and the Court sua sponte consolidated the motion for an injunction with the trial on the merits as to the New Start Defendants pursuant to Rule 65(a)(2), Fed. R. Civ. P. There were subsequent adjournments to October 5, October 18, and October 24, 2006. At the Mission's request, the hearing was held on October 31 and November 1, 2006.

At the conclusion of the hearing, the parties were directed to submit proposed findings of fact and conclusions of law and final argument was heard on November 29, 2006.

**The Facts**

New Start is the owner and landlord of 245 East 52nd Street, a six-story building containing two triplex apartments. Thompson and Galvin are principals of New Start. Golod, Martin, the Corcoran Group and James Associates are real estate brokers.

In January 2006, the Mission sought a residence for Intelmann that could also be used to host diplomatic functions

2

including meetings, receptions and dinners. Intelmann received brochures relating to the upper triplex at 245 East 52nd Street (the "Premises"). On January 26, 2006, Intelmann inspected the Premises and a list of items to be completed by New Start before the move-in date was given to New Start.

With the participation of the real estate brokers, but without representation by counsel, the Mission entered into a lease with New Start, dated February 1, 2006 (the "Lease"). The Lease provided for annual rent of $90,000 and stated:

> Utilities and services furnished to the demised premises for the benefit of the Tenant shall be provided and paid for as follows: water by the Landlord; gas by the Tenant; electricity by the Tenant; heat by the Tenant; refrigeration by the Landlord and Tenant; hot water by the Tenant.
>
> The Landlord shall not be liable for any interruption or delay in any of the above services for any reason.

The term of the Lease was from February 8, 2006 to February 7, 2007. The Mission paid $90,000 rent and brokerage fees when the Lease was executed.

At the time the Lease was executed, there was a gas hot water heater in the basement of the Premises, a gas stove in the kitchen, gas-powered heating and air-conditioning units on each floor of the Premises, and a gas fireplace.

3

When Intelmann arrived with movers on February 8, 2006, the gate to the Premises was padlocked. After it was opened, Intelmann determined that the gas stove, water heater, heating units and fireplace were inoperable. When she called Consolidated Edison ("Con Ed") to activate gas service, Intelmann was told that the gas system in the building was not connected nor operable. Intelmann received from Con Ed notices dated February 6, 2006; June 27, 2006; September 5, 2006; and Cctober 4, 2006 indicating that the building had an outstanding balance of $2,757.87 for past gas and electric service and that service would be disconnected unless payment was received. At no time while Intelmann resided at the Premises was gas service established.

On February 10, 2006, New Start advised Intelmann that the hot water heater was being converted to electric and that it was "doing everything in [its] power for Con Ed to turn on gas meter [sic]." (Pls.' Supplemental Mem. of Points and Authorities in Supp. of Order to Show Cause, Ex. F.) On February 11, 2006, New Start replaced the gas stove with an electric model. On February 15, 2006, New Start installed small 1500-watt electric heaters on each floor.

Intelmann testified at trial that despite these efforts by New Start, the heat and hot water supply continued to be inadequate. She stated that during periods of cold weather she and her family stayed with friends and colleagues because the Premises

4

were "extremely cold." (Trial Tr. at 55.) She also testified that she joined a local sports club so that she could "go and shower in the morning when there was no hot water" in the Premises.  (Id.)

Intelmann's testimony was confirmed by Marike Kokajev ("Kokajev"), the Deputy Permanent Representative of the Mission, who testified that Intelmann stayed at his residence for a period of time in February because of the lack of heat in the Premises (id. at 135) and that when he visited the Premises he sometimes had to wear a coat and scarf indoors to keep warm (id. at 136). Kokajev also testified that between February and September 2006, Intelmann often took showers at his apartment due to the lack of hot water in the Premises.  (Id. at 138.)

Mark Ginsberg ("Ginsberg"), a heating and air conditioning professional with approximately twenty-five years of experience in that field, testified at trial that the electric heating units and hot water heaters installed by New Start were inadequate to supply sufficient heat and hot water to the Premises. (Id. at 31-33.) Ginsberg stated that "maybe in one of the small bathrooms [a 1500-watt heating unit] might have been able to supply a little heat, but in the big rooms, in the whole hallway, no way." (Id. at 33.)

Intelmann also testified at trial as to numerous additional problems with the Premises, including broken locks on

5

the doors to the Premises (id. at 58-59), cracked and broken window frames (id. at 60), and "massive" water leaks from rain and improper plumbing on all floors of the Premises (id. at 63-66).

Correspondence ensued between Intelmann and the Landlord. Intelmann requested a copy of the Certificate of Occupancy from New Start but did not receive it.

Because of the lack of heat and hot water, and the other problems mentioned above, the Mission was unable to use the Premises for diplomatic functions and expended funds to obtain alternative space for necessary functions.

On August 7, 2006, the dispute between the parties was tentatively settled by agreement between counsel.  The agreement provided for payment of $7,500 to the Mission and a return of the prepaid rent pro rated at the time the Premises were vacated.  The stipulation formalizing this agreement was not executed.

On September 20, 2006, Intelmann moved her belongings out.  The Landlord padlocked the Premises on the following day.  On October 30, 2006, the keys to the Premises were made available to the Landlord.

6

**Conclusions of Law**

Although Plaintiffs did not raise claims of constructive eviction and breach of the warranty of habitability in the Complaint, evidence relating to both claims was proffered at trial without objection, and both Plaintiffs and the New Start Defendants explicitly addressed these claims in their post-trial memoranda. Accordingly, the pleadings in this matter will be deemed amended to conform to the evidence presented at trial, pursuant to Rule 15(b), Fed. R. Civ. P.

Under New York law, every residential lease binds the landlord to the following warranty of habitability: that the premises "are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life health or safety." N.Y. Real Prop. Law § 235-b(1). Failure to provide heat and hot water has been recognized as a breach of the warranty of habitability. Park W. Mgmt. Corp. v. Mitchell, 47 N.Y.2d 316 (N.Y. 1979); Salvan v. 127 Mgmt. Corp., 475 N.Y.S.2d 30 (N.Y. App. Div. 1st Dep't 1984).

The New Start Defendants have argued that the warranty of habitability does not apply in this instance because the Lease states that heat and hot water were to be "provided and paid for"

7

by the tenant. Even assuming that this language represented an agreement releasing the Landlord from its obligation to furnish heat and hot water, it is established law that any agreement by a residential tenant waiving the warranty of habitability is "void as contrary to public policy." N.Y. Real Prop. Law § 235-b(2).

The New Start Defendants have also contended that they did not breach the warranty of habitability because heat and hot water were provided by the electric heaters installed after Intelmann moved in. The trial testimony by Intelmann, Kokajev and Ginsberg established the lack of adequate heat and hot water in the Premises, and good-faith efforts by a landlord to provide heat and hot water are no defense to a breach of warranty claim. Leris Realty Corp. v. Robbins, 95 Misc. 2d 712, 715 (N.Y. Civ. Ct. 1978).

The Mission was constructively evicted by the failure of the Landlord to provide the Premises with adequate heat and hot water. The parties reached an agreement to resolve this dispute. The Premises were returned to the Landlord's control on October 30, 2006. The Mission is entitled to the return of one month's rent as damages for the breach of the warranty of habitability, and the return of the amount of rent paid for the period from October 31, 2006 to February 7, 2007, plus interest.

8

The Plaintiffs have not established cause to pierce the corporate veil and impose personal liability on Thompson and Galvin, the principals of New Start.

The Mission is entitled to recover attorney's fees and costs from New Start. Section 234 of the New York Property law provides that:

Whenever a lease of residential property shall provide that in any action or summary proceeding the landlord may recover attorneys' fees and/or expenses incurred as the result of the failure of the tenant to perform any covenant or agreement contained in such lease, or that amounts paid by the landlord therefor shall be paid by the tenant as additional rent, there shall be implied in such lease a covenant by the landlord to pay to the tenant the reasonable attorneys' fees and/or expenses incurred by the tenant as the result of the failure of the landlord to perform any covenant or agreement on its part to be performed under the lease or in the successful defense of any action or summary proceeding commenced by the landlord against the tenant arising out of the lease, and an agreement that such fees and expenses may be recovered as provided by law in an action commenced against the landlord or by way of counterclaim in any action or summary proceeding commenced by the landlord against the tenant.

N.Y. Real Prop. Law § 234. In other words, where a lease grants the landlord the ability to recover fees and costs in a successful action to enforce the terms of the lease, the tenant will possess a reciprocal right to recover fees and costs upon a failure by the landlord to perform its obligations under the lease, such as a breach of the warranty of habitability. The Lease provides that "[t]he Tenant agrees to pay, as additional rent, all attorney's fees and other expenses incurred by the Landlord in enforcing any

9

of the obligations under this lease." (Compl. Ex. G.) Having demonstrated a breach of the warranty of habitability, the Mission is entitled to recover reasonable attorney's fees and costs.

**Conclusion**

Upon the findings and conclusions set forth above, judgment will be granted for the Mission against New Start in the amount of the rent paid for the period between October 31, 2006 and February 7, 2007, plus one month's rent, plus attorney's fees, costs and disbursements.

Submit judgment on notice.

New York, NY
March  6  , 2007

ROBERT W. SWEET
U.S.D.J.

10